IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JAN DEMILLE,<br><br>        Plaintiff,<br><br><br><br>                vs.<br><br><br>JO ANN B. BARNHART, Commissioner of<br>the Social Security Administration,<br><br>        Defendant. | ORDER REMANDING CASE TO<br>COMMISSIONER<br><br><br><br><br><br>Case No. 2:06cv00159 |

The plaintiff, Ms. Jan Demille, brings this action pursuant to 42 U.S.C. § 405(g), to review the Social Security Administration Commissioner's final decision denying her application for Disability Insurance Benefits and Supplemental Security Income Benefits.  Ms. Demille argues the Administrative Law Judge (ALJ) wrongly rejected her disability and benefits claims. The court remands this case, finding that the ALJ erred in his evaluation of Ms. Demille's residual functional capacity.  Specifically, he failed to follow Tenth Circuit precedent when he considered Ms. Demille's failure to undergo mental health treatment in his determination of disability.  The court, therefore, REMANDS the case to the Commissioner for further proceedings.

## FACTS AND FINDINGS

For the purposes of this appeal, the court finds the following facts.

*A.     General Background*

On December 14, 1999, at the time of the onset of her alleged condition, Ms. Demille was forty-three-years old.  She had completed two years of college and had previously worked as a waitress, apartment manager, receptionist, fast food supervisor, housekeeper, cook, and daycare provider.

On August 22, 1996, Bruce Williams, M.D., treated Ms. Demille for possible thyrotoxicosis (excessive thyroid hormone levels), a mite infection, and severe anxiety.  She claimed she was dying and threatened to kill herself if her thyroid was not removed.  On August 29, 1996, Dr. Williams performed a thyroidectomy on Ms. Demille.  Between September 16, 1996, and January 19, 1997, Ms. Demille treated her thyroid symptoms with medication.

In January 1997, Ms. Demille was diagnosed with ulcerative gastroesophegeal reflux disease (GERD) and a hiatal hernia that required surgery.  Dr. Williams performed a esophagogastroduodenoscopy to repair the GERD and hernia.

In December 1998, Ms. Demille complained of unsteadiness to Jerry Marsden, M.D.  Dr. Madsen ordered testing to be done.  On December 21, 1998, as a result of testing, Ray Jolley, an audiologist, found Ms. Demille had normal auditory functioning.  On January 8, 1999, Dr. Marsden diagnosed Ms. Demille with resolved vertigo.  He prescribed dietary changes and recommended she consult with a neurologist if her symptoms persisted.

On April 4, 1999, Ms. Demille complained of abdominal pain, vomiting, and nausea, at

the Dixie Regional Medical Center.  She was diagnosed with abdominal pain and acute

gastroenteritis.  On May 3, 1999, Dr. John T. Miller performed gall bladder removal surgery on

Ms. Demille.

On June 15, 1999, Ms. Demille complained to Gary L. Jones, M.D., a neurologist, of ear

pain and persistent dizziness while sitting and standing.  Dr. Jones concluded Ms. Demille likely

suffered from type IV dizziness which is "vague lightheadedness" not identified as vertigo,

faintness, or disequilibrium.  On June 17, 1999, Ms. Demille received an MRI of her brain; the

MRI showed nothing unremarkable.

On June 21, 1999, Ms. Demille complained of weakness in her arms and legs, at the

Dixie Regional Medical Center.  Doctors diagnosed her with diabetes, generalized weakness, and

labyrinthitis (inner ear inflammation) with vertigo and shakiness, and prescribed medications.

Ms. Demille returned to the hospital on November 22, 1999, complaining of dizziness and

weakness.  A CT scan of her head revealed no intracranial abnormalities.  The emergency room

physician diagnosed Ms. Demille with vertigo and persistent right ear pain, and prescribed

medications to her.

On December 13, 1999, Ms. Demille saw Dr. Marsden and complained of an inability to

walk or stand without support.  Dr. Marsden found Ms. Demille's eye, ear, and neurological

examinations to be normal.  Ultimately, he could not determine the cause of Ms. Demille's

reported problem.  Dr. Marsden recommended that Ms. Demille undergo balance testing.

On May 19, 2000, Ms. Demille underwent an electronystagmogram (a test for balance

problems that assesses damage to acoustic nerves) at IHC's Balance Center in Salt Lake City.  A

sub-test and sinusoidal tracking test revealed abnormal results with accadic intrusions, especially with work targeting.  Sensory organization tests also showed abnormalities, but motor control and adaptation tests resulted in normal findings.  Medical personnel at the Balance Center referred Ms. Demille to G. Arun Kumar, M.D., for a neurology consultation.

On June 5, 2000, Dr. Kumar saw Ms. Demille.  Dr. Kumar took note of the fact that Ms. Demille's symptoms followed her thyroid surgery.  He found Ms. Demille had normal cranial nerves; muscle bulk, tone, and strength; reflexes; coordination; sensation; and gait.  Dr. Kumar concluded Ms. Demille's history and findings were unconvincing for central vertigo.  He recommended she undergo an MRI, intracranial MRA, sleep deprived EEG, ENT referral, and vestibular rehabilitation exercises.  Dr. Kumar also told Ms. Demille to follow up with Dr. Jones.

On June 13, 2000, Ms. Demille underwent a brain MRI which showed no tumors or abnormal blood flow.  But it did reveal some twisting of the blood vessels toward the back of her brain.  On June 15, 2000, Ms. Demille underwent an EEG, with normal results.

On June 19,  2000, Ms. Demille complained to Dr. Marsden that she was unable to work due to incapacitating vertigo.  She requested an anti-anxiety medication, Ativan, because she felt better when taking it.  Dr. Marsden found normal results from Ms. Demille's eye and ear examinations, but found a pattern of vestibular dysfunction.  Dr. Marsden recommended that Ms. Demille undergo rehabilitation and limit herself to sedentary work activities.

On September 13, 2000, Ms. Demille reported to Dr. Marsden that her vertigo had reoccurred after a period of resolution.  Dr. Marsden's eye, ear, and neurological examinations of Ms. Demille revealed normal results.  Dr. Marsden recommended rehabilitation for Ms.

Demille's recurrent imbalance of unknown cause.

On October 27, 2000, Ms. Demille was treated with antibiotic medications for a urinary tract infection and pyelitis (inflammation due to kidney stones).

On December 13, 2000, Robert Cope, M.D., saw Ms. Demille for complaints of recurrent bladder infections, lumbar pain, and swelling.  He prescribed medications to her.

On January 5, 2001, Ms. Demille went to Red Cliffs Family Medicine complaining of depression and hypoglycemic episodes.  Medical personnel diagnosed her with hypoglycemia and prescribed medications and exercise. On January 15, 2001, Ms. Demille complained of elevated blood sugar.  Medical staff at Red Cliffs diagnosed her as being glucose intolerance and having probable diabetes mellitus.  They prescribed medication to Ms. Demille.

On January 25, 2001, Ms. Demille complained of dizziness and weakness at the emergency room of the Dixie Regional Medical Center.  Physicians diagnosed her with diabetes, chronic pain, and weakness of an unknown cause.

In February 2001, Ms. Demille returned to Red Cliffs because she felt shaky and faint. Medical personnel diagnosed her with possible mitral prolapse, high blood pressure, and chronic neck pain.  The staff prescribed medications to her.  A later echocardiogram, on March 7, 2001, revealed normal results.

On March 13 2001, Ms. Demille again returned to Red Cliffs, complaining of dizziness. Medical staff adjusted her medications and x-rayed her neck.  The x-ray results were normal.

On March 20, 2001, Jackie Murray, physician's assistant saw Ms Demille for complaints of fainting, heart valve problems, weakness, and fatigue.  Ms. Murray noted that Ms. Demille had

an odd psychiatric effect and wore sunglasses during the entire visit.  However, she found Ms.

Demille's judgment, orientation, and memory to be normal.  Ms. Murray noted Ms. Demille had

an abnormal liver function test, syncope, weakness, and fatigue.  On March 23, 2001, Ms.

Demille underwent a Holter monitor study (a type of echocardiogram) with normal results.

     On March 27, 2001, Ms. Demille complained of weakness to Ms. Murray.  She asked

Ms. Murray to fill out a form indicating Ms. Demille lacked any functional capacity for work.

She also requested Ms. Murray to sign a self-written note saying Ms. Demille had been bed-

ridden for over one year.  Ms. Murray refused.  Ms. Murray reported Ms. Demille again wore

sunglasses during the visit and acted in a distracted manner.  An echocardiogram performed on

Ms. Demille that day produced normal results.  Ms. Murray diagnosed Ms. Demille with

weakness and syncope, high blood pressure, high cholesterol, elevated glyceride levels, and mild

hyperthyroidism.  Ms. Murray adjusted Ms. Demille's medications.

     On March 30, 2001, Ms. Demille again saw Ms. Murray.  Ms. Demille reported she was

doing a little better.  Ms. Demille again wore sunglasses during the visit and, according to Ms.

Murry, had an ambivalent attitude.  Ms. Murray found Ms. Demille's neurological examination

to be abnormal.  Ms. Murray also noted Ms. Demille had a balance deficit and tachycardia.  Ms.

Murray recommended that Ms. Demille have a brain MRI, and she referred Ms. Demille to a

psychiatrist for a functional capacity evaluation.  An MRI performed on April 18, 2001, revealed

that Ms. Demille's brain was stable — the results fell within normal limits.

     On April 27, 2001, Ms. Demille complained of dizziness and imbalance to Ms. Murray.

Ms. Murray reported that all of Ms. Demille's diagnostic tests and reports date were normal, with

the exception of Ms. Demille's difficulty performing Romberg, heel-to-toe gait, and fingertip-to-nose tests.  Ms. Murray diagnosed Ms. Demille with dizziness, imbalance, and benign vertigo. She recommended that Ms. Demille undergo physical therapy, and she refilled Ms. Demille's medications.

On May 4, 2001, Scott Gillespie, a physical therapist, saw Ms. Demille.  Mr. Gillespie administered treatment exercises to Ms. Demille, and found she had decreased strength, balance, and mobility.

At a visit with Ms. Murray on May 25, 2001, Ms. Demille requested Oxygen.  Ms. Demille had undergone a test to determine blood Oxygen levels the previous night.  Ms. Demille told Ms. Murray she felt better, but not well.  She reported that therapy was helping her balance, but that she suffered from headaches.  Ms. Murray diagnosed Ms. Demille with vertigo and headaches.  She found the oximetry test results to be abnormal, and she recommended that Ms. Demille participate in a sleep study.

On June 28, 2001, Mr. Gillespie reported in a letter his belief that Ms. Demille was not able to function at a job because of concerns that she may suffer from imbalance for periods of time.  Mr. Gillespie thought an employer may not hire Ms. Gillespie because of the times in which imbalance kept her from activity.

On June 29, 2001, Ms. Murray saw Ms. Demille again.  In response to Ms. Demille's request, Ms. Murray again refused to complete any forms releasing Ms. Demille from work.  Ms. Murray advised Ms. Demille to continue with therapy and to participate in a sleep study.  She also prescribed medications.

On July 20, 2001, Ms. Demille returned to Ms. Murray and asked for refills of her medication.  She again requested Ms. Murray to sign a disability form.  Ms. Murray responded that she possessed insufficient clinical information to make a determination about Ms. Demille's ability to work.  Ms. Murray noted Ms. Demille had some difficulty maintaining balance when leaving the exam room, but that she had no trouble prior to that point.  She diagnosed Ms. Demille with vertigo and dizziness.  Ms. Murray prescribed medication to Ms. Demille and encouraged her to see an audiologist for testing.

On August 21, 2001, Ms. Demille visited the emergency room and complained of abdominal pain, painful urination, and blood in her urine.  Her urinalysis showed abnormal results.  An ER physician diagnosed Ms. Demille with pyelonephritis (kidney inflammation) and prescribed medications.

On November 1, 2001, R. Sander, M.D., concluded Ms. Demille had no established exertional limitations.  Dr. Sander found only Ms. Demille's postural limitations prohibited her from climbing ladders, ropes, and scaffolds.  Ms. Demille had no established manipulative, visual, or communicative limitations, according to Dr. Sander, but she needed to avoid even moderate exposure to hazards.

On February 6, 2002, Ms. Demille complained of weakness to Gay Sleight, a physician's assistant.  She requested that Ms. Sleight complete a form indicating she lacked functional capacity for work and sign a note indicating she had been bed-ridden for over a year.  In the same visit, Ms. Demille told Ms. Sleight she was "no longer sitting at home suffering," instead, she

was "attending school and manag[ing] her vertigo on a day to day basis."[1]  Ms. Sleight noted Ms. Demille had an improved mood and affect.  She diagnosed Ms. Demille with diabetes and Graves' disease, GERD, and chronic pain syndrome.  Ms. Sleight refilled Ms. Demille's prescription medications.

On February 23, 2002, Ms. Demille complained of low back pain at the emergency room.  A physician diagnosed her with low back pain and kidney inflammation and prescribed antibiotic and pain medications.  In March 2002, Warren J. Stucki, M.D., treated Ms. Demille with medications for a recurring urinary tract infection.  James R. Grua, M.D., an endocrinologist, also saw Ms. Demille.  Ms. Demille complained of feeling tired, and voiced fear of becoming a diabetic and getting kidney stones.  Dr. Grua concluded Ms. Demille's reflexes were brisk, she had no neck masses or tremors, and she was probably fine with regard to her thyroid issues.

In June 2002, Ms. Murray prescribed medications to Ms. Demille to treat another urinary tract infection.  On July 9, 2002, Ms. Demille complained of low back and abdominal pain at the emergency room.  A physician prescribed medications to treat persistent blood in Ms. Demille's urine, and noted Ms. Demille had a "strange affect."  The physician found no evidence of a urinary tract infection.

On July 15, 2002, Ms. Demille returned to the emergency room, complaining of nausea and vomiting.  The physician described Ms. Demille as exhibiting difficult behavior and noted she was forcing herself to vomit.  Ms. Demille apparently refused nausea or pain medications and

---

[1]R. 416.

a psychiatric evaluation.  The physician prescribed medications to Ms. Demille, diagnosing her

with anxiety and a possible personality disorder.

Ms. Demille underwent an abdominal CT scan on July 16, 2002 — the scan showed no

obstructive uropathy.  On September 26, 2002, Dr. Cope assessed Ms. Demille after she

complained of lower abdominal pain.  Dr. Cope was unable to find urologic pathologies after

reviewing her imaging studies.

Christina J. Durham, Ph.D., conducted a consultive psychological examination on Ms.

Demille on January 27, 2003.  Ms. Demille reported an inability to visit stores, and reported she

sometimes had difficulty walking and using the bathroom, and sometimes had low energy.  She

explained to Ms. Durham that she only went places if she had to; she prepared meals

intermittently; and she read, wrote, crocheted, and provided for her own personal needs.  Ms.

Demille reported she could engage in a number of seated tasks, feared standing due to dizziness,

and feared passing out, which kept her from driving.  According to Ms. Demille, she was able to

answer phones and respond to callers, and she made friends easily.  Ms. Demille told Dr.

Durham she worked on her laptop computer, and she was trying to publish three books she had

written.  Dr. Durham found Ms. Demille to be responsive and focused, with logical and coherent

thoughts.  She could follow commands, adequately read and write, compute normally, and

concentrate.  Ms. Demille's recent memory was intact, but her remote memory was impaired, and

she had somewhat slow, tangential speech.  Dr. Durham concluded that Ms. Demille possessed

adequate social judgment, but she preferred isolation.

Dr. Durham diagnosed Ms. Demille with generalized anxiety disorder and major

depressive disorder.  She noted "some concern" of conversion disorder and noted the need to rule

it out.[2]  She assigned Ms. Demille a Global Assessment of Functioning (GAF) score of 50 to 55.

She concluded that, without mental health intervention, Ms. Demille would continue to

experience emotional and physical problems impairing her ability to engage socially, maintain

employment, and feel successful.  Dr. Durham noted Ms. Demille needed help meeting her basic

emotional, financial, and daily living needs.

On February 1, 2003, Rebecca Dalisay, M.D., a State consultant, concluded Ms. Demille

suffered from depression and an anxiety-related disorder.  Dr. Dalisay noted the need to rule out

a conversion disorder.  She concluded that these problems resulted in mild limitations on Ms.

Demille's daily activities, concentration, persistence, and pace; and moderate limitations on her

social functioning.  Dr. Dalisay also found Ms. Demille had a moderately limited ability to

understand, remember, and carry out detailed instructions; work with others; interact

appropriately with the public; accept instructions and criticism; respond to workplace changes;

travel to new places; and set goals.  She found Ms. Demille had no other significant mental

limitations.  Dr. Dalisay ultimately concluded Ms. Demille could follow one-to-two step

instructions and perform simple tasks, with minimal public contact.  On April 1, 2003, John Gill,

Ph.D., a State consultant, affirmed Dr. Dalisay's findings.

On March 31, 20003, Ms. Demille underwent abdominalplasty surgery (a "tummy tuck").

On June 29, 2004, Robert Rignell, M.D., a doctor who previously treated Ms. Demille for

---

[2]*Id.* at 461.

thyroid problems, assessed Ms. Demille's residual functional capacity.  Dr. Rignell indicated she

had a restricted ability to work.  However, he qualified his conclusions by stating all of his

comments were obtained from Ms. Demille, he had not treated or evaluated most of her

problems, and his knowledge of the determinations on the RFC report was "peripheral."[3]

      In September 2002, Ms. Demille submitted a daily activities questionnaire to the Social

Security Commission, wherein she stated that she required assistance with bathing at times when

she felt dizzy.  Ms. Demille indicated she sometimes prepared her own meals, performed minor

household chores, read, crocheted, watched television, received visitors and family, and went out

for dinner.  She explained that she wrote and worked on her computer.  According to her report,

Ms. Demille did not drive, needed help walking, and was unable to sit or stand for long periods.

In her disability reports, Ms. Demille indicated she had Medicaid coverage.

      In March 2003, Ms. Demille's mother, Lucille Whitlow, submitted a statement wherein

she indicated Ms. Demille was able to use a laptop computer; have a good conversation over the

phone, and receive visitors.  She noted that Ms. Demille had no markedly unusual behavior.  She

indicated her belief that Ms. Demille could not and did not prepare meals, shop, perform

household chores, exercise, drive a car, or sit, stand, or walk for very long.

      *B.*    *Benefits Hearing and Ms. Demille's Appeal*

      On September 13, 2002, and October 9, 2002, Ms. Demille filed applications for

Supplemental Security Income Benefits and Disability Insurance Benefits.  She alleged the

---

[3] *Id.* at 495.

existence of a disabling condition with an onset of November 14, 1999.  The Social Security

Administration denied her claim initially.  On September 13, 2004, following reconsideration of

the denial, Ms. Demille testified at a hearing held in Cedar City, Utah.  On January 4, 2005, the

Administrative Law Judge issued a decision concluding Ms. Demille was not disabled.

At the hearing on September 13, 2004, Craig Swaner, Ph.D., a medical expert, testified

that Dr. Durham's examination of Ms. Demille lasted about ninety minutes and Dr. Durham's

diagnoses were based on the history provided by Ms. Demille.  He said that at the time Dr.

Durham reported her opinion, Dr. Durham believed psychological factors affected Ms. Demille's

daily activities and her ability to work.

Ms. Demille testified to her inability to work due to vertigo, blood in her urine, pain, and

depression.  She maintained that due to her illnesses, she would be an inconsistent employee.

Ms. Demille asserted that weakness and imbalance made walking difficult — she required a cane

or other assistance.  She said was unable to walk at a regular pace on even ground and she had

trouble climbing stairs.  Ms. Demille declined to drive because she feared passing out, and pain

prohibited her from walking or sitting for long periods.

Ms. Demille testified she was not obtaining mental health treatment because she did not

want her mother and children to pay for it.  Ms. Demille stopped the mental health treatment she

had received in the past because she felt it failed to address her problems.  She took no

medications for her mental impairments.  Ms. Demille spoke of her diabetes, which she treated

by controlling her diet.  She complained of constant knee and hip pain.  She explained that when

she took her medication, she suffered from no thyroid problems.

A vocational expert, Kenneth Lister, testified to Ms. Demille's previous jobs and her ability to work. He relayed that Ms. Demille's past work included jobs as a waitress (a semi-skilled, light job), and a housekeeper (an unskilled, light job). He found Ms. Demille's past, relevant work to also include the job of fast food manager. The ALJ requested that Mr. Lister review a hypothetical scenario. He described an individual of Ms. Demille's age, with the same educational background, and work experience. The ALJ described theoretical medical conditions, residual functional capacity, and additional theoretical limitations — all of which he classed as "mild." Mr. Lister testified that an individual in this hypothetical situation would have the ability to perform light and sedentary work. For example, such a person could work as a fast food supervisor, a waitress, or a housekeeper.

Ms. Demille's attorney disagreed with the ALJ's hypothetical. He posited his own hypothetical scenario and asked Mr. Lister about the hypothetical individual's ability to work. Mr. Lister testified that such a person could not work at any of the jobs noted, nor at any job in the national economy.

The ALJ followed a four step process, pursuant to the Social Security Administration's regulations, to determine if Ms. Demille qualified for disability benefits.[4] Under step one of the evaluation, where the ALJ considers whether the claimant is working,[5] the ALJ found Ms. Demille had not engaged in substantial employment since her alleged onset date. At step two,

---

[4] *See* 20 C.F.R. § 404.1520.

[5] *Id.* § 404.1520(b)(c).

the evaluation of whether the claimant has a severe impairment,[6] the ALJ found only Ms.
Demille's depression and anxiety disorder qualified as severe impairments.  At the third step, the
ALJ determines whether the impairment meets or equals an impairment on a Listing of
Impairments.[7]  The claimant's disability is established if the claimant's impairment meets or
medically equals a Listings impairment.[8]  The ALJ found Ms. Demille's did not suffer
presumptively disabling impairments because her impairments failed to meet or medically equal
the requirements of any section in the Listings.

Steps four and five relate to the claimant's residual functioning capacity.  At step four, the
ALJ determines whether the impairment prevents the claimant from doing past relevant work.[9]
The ALJ only reaches step five if the ALJ determines the claimant cannot perform the work the
claimant performed on the past.[10]  At step four, the ALJ concluded Ms.Demille's residual
functional capacity would not preclude her from performing her past relevant work as a fast food
supervisor, waitress, and housekeeper.  He determined Ms. Demille could do heavy, medium,
light, and sedentary work, despite the vocational expert's testimony that a person with the mild
hypothetical limitations the ALJ posed, could do only light and sedentary work.  The ALJ did not
reach step five in this case.  Because the ALJ concluded Ms. Demille was not disabled under the

---

[6] *Id.*

[7] *Id.* § 404.1520(d).

[8] *Id.*

[9] *Id.* § 404.1520(e).

[10] *Id.* § 404.1520(f).

Social Security Act or regulations, he ALJ denied Ms. Demille's disability and supplemental income benefits.  On February 4, 2005, Ms. Demille requested that the Appeals Council review the ALJ's decision — the Appeals Council denied this request.

In her appeal to this court, Ms. Demille seeks review of the Commissioner's final decision denying her claims.  She does not dispute the ALJ's findings under step one and step two of the sequential evaluation process.  Instead, she argues the ALJ neglected to properly explain his finding that Ms. Demille's condition failed to meet the Listings and the ALJ's finding that Ms. Demille's condition does not meet the Listings is unsupported by substantial evidence. She also asserts that the ALJ's conclusions about Ms. Demille's residual functioning capacity are unsupported by the evidence.  Next, she claims the ALJ improperly rejected the opinions of Ms. Demille's examining physician, Dr. Durham, and of the State physician.  Finally, Ms. Demille argues the ALJ improperly considered the vocational expert's opinion.

The Commissioner counters that sufficient medical evidence supported the ALJ's finding that Ms. Demille's condition failed to meet the Listings.  She further contends that substantial evidence supported the ALJ's conclusions about Ms. Demille's residual functioning capacity. The Commissioner also argues that the ALJ's decision to discount Dr. Durham's opinion as well as those of the State consultants was proper and legitimate.  Finally, the Commissioner claims the ALJ's consideration of the vocational expert's opinion was proper because his opinion was based on a hypothetical situation that legitimately reflected Ms. Demille's condition, as demonstrated by the record evidence.

**STANDARD OF REVIEW**

The court reviews Ms. Demille's appeal of the Commissioner's decision "to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied."[11]  The Commissioner's findings are conclusive "if supported by substantial evidence."[12]  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[13] The court must not re-weigh the evidence or re-try the case, but must "meticulously examine the record as a whole, including anything that might undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[14]

**DISCUSSION**

A.    *Substantial Evidence Supports the ALJ's Determination That Ms. Demille's Impairment Failed to Meet the Requirements of Listing 12.07 and That It Was Not Medically Equivalent.*

Ms. Demille argues she presented sufficient evidence of a somatoform disorder to meet the requirements of Listing 12.07 or to show her condition was medically equivalent, under step three of the sequential evaluation process.  She also argues the ALJ neglected to explain his finding that her condition failed to meet Listing 12.07 requirements.  Ms. Demille does not dispute the ALJ's finding that none of her other impairments, such as diabetes, hyperthyroidism,

---

[11]  *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

[12]  42 U.S.C. § 405(g).

[13]  *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

[14] *Id*. at 1262.

depression, and anxiety, failed to meet the requirements of the Listings.  She only disputes the ALJ's findings with regard to somatoform disorder.

Somatoform disorder is defined as, "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."[15]  To meet the criteria of Listing 12.07, the claimant must establish, by medical evidence, one of the following "A" criteria:

> 1.  A  history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
> 2.  Persistent nonorganic disturbance of . . . Vision[,] Speech[,] Hearing[,] Use of a limb[,]  Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia)[,] or Sensation (e.g., diminished or heightened).
> 3.  Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury.[16]

In addition, the claimant must have medical evidence that the medically documented "A" criteria resulted in at least two of the following "B" criteria: "[1] Marked restriction of activities of daily living; or [2] Marked difficulties in maintaining social functioning; or [3] Marked difficulties in maintaining concentration, persistence, or pace; or [4] Repeated episodes of decompensation, each of extended duration."[17]

Ms. Demille relies on *Clifton v. Chafer*,[18] to argue the ALJ failed in his duty to explain

---

[15]  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.07.

[16] *Id.* § 12.07(A).

[17] *Id.* § 12.07(B).

[18] 79 F.3d 1007 (10th Cir. 1996).

why Ms. Demille's condition did not meet the requirements of Listing 12.07. However, this case differs from *Clifton*. In *Clifton*, the Tenth Circuit remanded the case so the ALJ could specifically outline his findings with regard to whether the claimant's impairments met or equalled the requirements of the Listings.[19] The ALJ had submitted a bare conclusion, entirely lacking an explanation of the evidence, stating that the claimant's impairments failed to meet the requirements of the Listings.[20] The Tenth Circuit concluded an ALJ "is not required to discuss every piece of evidence" but must provide more explanation of his review of the evidence and the reasons for his findings.[21]

In this case, the ALJ wrote multiple paragraphs detailing his review of the relevant evidence and discussing why Ms. Demille's affective, anxiety, and somatoform conditions failed to meet various Listings. The ALJ reviewed the State physician's report, which concluded Ms. Demille's conditions resulted only in mild restrictions on daily activities, moderate difficulties with social functioning, and mild difficulties in maintaining concentration, persistence, or pace. In other words, even if a somatoform disorder existed, the medical evidence failed to show it resulted in two of the "B" criteria of Listing 12.07. The State physician found no "marked" difficulties in these categories — only mild and moderate. And she found insufficient evidence to establish any episodes of decompensation. This review of the evidence provides a substantial basis to support the ALJ's conclusion that Ms. Ms. Demille's conditions failed to meet the

---

[19] *Id.* at 1010.

[20] *Id.* at 1009.

[21] *Id.* at 1009–10.

requirements of Listing 12.07 and were not medically equivalent.  Further, the ALJ was entitled to rely on these conclusions of the State physician in this manner.[22]  Unlike the bald conclusion at issue in *Clifton*, therefore, the ALJ addressed the evidence sufficiently for the court to allow the court to conduct meaningful judicial review.[23]

Additionally, the ALJ specifically noted that the State physician's diagnosis of a somatoform disordered carried no weight because no treating or examining physicians made this diagnosis.  Ms. Demille argues against the ALJ's disregard of her somatoform diagnosis, claiming he erred by "picking and choosing" evidence to support his position.  However, the State physician only diagnosed Ms. Demille with somatoform disorder on a "rule out" basis, and she rated the effect of Ms. Demille's conditions such that it failed to meet the requirements of Listing 12.07.  It is illogical to argue the ALJ should rely on the State physician's diagnosis of somatoform disorder but ignore her conclusions about the disorder's effect on Ms. Demille's life.

Ms. Demille also points to a couple of equivocal comments by other doctors as evidence of Ms. Demille's somatoform disorder.  For instance, Ms. Demille argues Dr. Durham's note about Ms. Demille possibly converting issues from her past into physical symptoms and Dr. Kumar's determination that Ms. Demille's history and physical findings were not convincing for vertigo support a diagnosis of somatoform disorder.  However, neither Dr. Durham nor Dr. Kumar diagnosed "[p]hysical symptoms for which there are no demonstrable organic findings or

---

[22] *See* 20 C.F.R. §§ 404.1526, 416.926.

[23] *See Clifton*, 79 F.3d at 1009.

known physiological mechanisms."[24]  Instead, Dr. Durham diagnosed anxiety and depression and

Dr. Kumar merely concluded Ms. Demille did not have vertigo.  This evidence, therefore, fails to

support Ms. Demille's position, especially given the number of medical professionals who

examined Ms. Demille without diagnosing a somatoform disorder.  Further, even if the ALJ had

fully accepted that Ms. Demille had somatoform disorder, the evidence substantially supports a

conclusion that the disorder did not meet the criteria "B" requirements of Listing 12.07.

        In sum, the ALJ's conclusion that Ms. Demille's impairments were not presumptively

disabling, at the third step of the sequential evaluation, is supported by substantial evidence in

the record.  The evidence is such that a reasonable mind may accept it as adequate to support the

ALJ's conclusion.

        B.      *Substantial Evidence Fails to Support the ALJ's Assessment of Ms. Demille's*
                *Residual Functioning Capacity.*

        With regard to step four of the ALJ's evaluation, the court must remand the case.  Ms.

Demille argues the ALJ's assessment of her Residual Functioning Capacity (RFC) is not

supported by sufficient evidence.  The RFC is based on "all the relevant evidence in [the] case

record"[25] and is used to determine the claimant's ability to do past relevant work.[26]  With regard

to Ms. Demille, the ALJ determined,

        [s]he has the residual functional capacity to perform heavy, medium, light and
        sedentary exertional work.  She has no exertional limitations.  She can

_____

[24]  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.07.

[25]  20 C.F.R. § 416.945.

[26]  *See id.*

continuously (67% – 100% of an eight hour workday) balance.  She can sit, stand, and walk for six hours each in an eight-hour workday.  She has mild limitations in the areas of concentration, memory, exercising judgment, remembering work procedures, performing duties within a schedule, sustaining a routine without supervision, relating with others, interacting with the general public, and dealing with stress.  She has no limitations in getting along with co-workers, following detailed instructions, following simple instructions, and understanding. She has normal vision and hearing, bilaterally.  She has no postural, manipulative, visual, environmental, or communicative limitations.[27]

The ALJ then used this RFC determination to find that Ms. Demille could return to her past work as a fast food supervisor, waitress, or housekeeper.  Ms. Demille claims error in three ways. First, she argues the ALJ erroneously discounted Dr. Durham's opinion.  She next claims the ALJ improperly discounted the opinions of the State physicians.  Finally, she argues the ALJ failed to identify any evidence of record on which he based his RFC determination and the ALJ improperly rejected the opinion of the vocational expert.  Because the court finds the ALJ improperly discounted the opinion of the State physician, the court does not address Ms. Demille's other claims of error with regard to the RFC determination.

The State physician, Dr. Dalisay, completed an RFC form indicating Ms. Demille was "Moderately Limited" in eight of twenty categories.  But based on his conclusion that this assessment was made of Ms. Demille when untreated, the ALJ found Ms. Demille had only mild limitations in these areas.

An ALJ may assign weight to a physician's opinion based on several factors.[28]  These factors include the claimant's relationship with the physician, the length of the treatment

---

[27] R. 33.

[28] *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

relationship and frequency of examination, the nature and extent of the treatment relationship, the

supporting evidence of an opinion such as laboratory findings and medical signs, the opinion's

consistency with the record as a whole, the opining physician's area of speciality, and other

factors.  In this case, the ALJ varied the weight he gave the opinion of Dr. Dalisay.  First, he

afforded substantial weight to the ALJ's assessment that Ms. Demille had no exertional

limitations, stating only that it was well-supported by clinical and laboratory evidence and was

not inconsistent with other substantial evidence.  This is problematic because the ALJ did not

detail what clinical or laboratory evidence supported this assessment or why he found it

compelling.

The larger problem, though, is that the ALJ only afforded moderate weight to Dr.

Dalisay's opinion as to the degree of Ms. Demille's limitations.  The ALJ explained that he

discounted Ms. Dalisay's opinion that Ms. Demille was moderately limited in eight categories

solely because, "[i]t appear[ed] that the State agency physician assessed the claimant based on

her condition without treatment."[29]  As an initial matter, it is not clear how the ALJ reached this

conclusion.  In her report, Dr. Dalisay did not frame her findings in light of Ms. Demille's lack of

mental health treatment.  And, ultimately, regardless of how Dr. Dalisay framed her findings, the

ALJ made an impermissible jump in logic by concluding Ms. Demille's limitations would be less

severe if she received treatment.

The ALJ's conclusion — that if Ms. Demille received mental health treatment she would

---

[29] R. 32.

only face mild limitations — is problematic because the ALJ failed to explain the basis for his conclusion and because the record does not appear to support his conclusion.  Moreover, the ALJ failed to follow Tenth Circuit precedent by reviewing Ms. Demille's failure to obtain treatment in light of the test in *Frey v. Bowen*.[30]  In *Frey*, the court set out factors that must be considered when reviewing the effect of a claimant's failure to undergo treatment on a disability determination: "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse."[31]

Rather than assessing these factors, the ALJ concluded simply that Ms. Demille "has not offered an acceptable reason why she has not followed her doctors' suggestions to seek mental health treatment and medications."[32]  Although the ALJ referred to "treatment and medications" he never specified what treatment or which medications were at issue.  The most likely reason for this lack of specificity is that none of Ms. Demille's physicians had affirmatively prescribed mental health treatment or medications to her — from the record this appears to be the case.  The medical records reflect that Ms. Demille's only contact with a mental health professional was with Dr. Durham.  Although Ms. Demille made a vague reference to attending counseling at some point in the past, no records support this.  Dr. Durham's report does not indicate that she prescribed a specific treatment or that Ms. Demille unjustifiably refused any treatment.  Instead,

---

[30] 816 F.2d 508 (10th Cir. 1987).

[31] *Id.* at 517.

[32] R. 32.

it only notes that "without mental health intervention" Ms. Demille's problems would continue and that Ms. Demille had a "reluctance" to face certain issues.[33]  In fact, the record does not indicate that Ms. Demille ever refused any treatment prescribed or recommended to her.  Finally, the most significant factor — whether any such treatment would restore Ms. Demille's ability to work — was never addressed by Dr. Durham or by the ALJ.  And the ALJ pointed to no evidence supporting that any treatment would have this kind of effect.  Other than the ALJ's summary conclusion that treatment would result in only mild limitations for Ms. Demille, he did not assess this factor.

The Commissioner requests the court to apply a harmless error analysis to the ALJ's determinations in this case.  However, harmless error review is only appropriate to supply a missing dispositive finding "where based on the material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."[34]  If allowed more broadly, a harmless-error determination "risks violating the general rule against post hoc justification of administrative action,"[35] to the extent it rests on matters not considered by the ALJ.  The court cannot confidently say no reasonable factfinder, following *Frey*, would find that Ms. Demille suffered more than mild limitations.  Because the degree of Ms. Demille's limitations ties directly into her ability to work — the dispositive issue in this case — a harmless

---

[33] *Id.* at 462.

[34] *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

[35] *Id.* at 1145.

error determination is inappropriate.

Due to the fact that the ALJ based his disability determination on a finding of Ms.

Demille's lack of treatment, but he failed to follow *Frey*, the court remands this case to the ALJ

for a proper determination of Ms. Demille's RFC.  Based on this remand, the court does not

reach the remainder of Ms. Demille's claims of error.

<u>**CONCLUSION**</u>

The court remands this case for a proper determination of Ms. Demille's RFC.  The ALJ

improperly evaluated the effect of non-treatment on Ms. Demille's RFC, failing to follow Tenth

Circuit precedent.  Accordingly, the court GRANTS Ms. Demille's motion to remand the case.

The Clerk's Office is directed to close this case.

DATED this  27 day of November, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge